**IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-CV-02539-RM-STV

ANDRE WILLIAMS,

    Plaintiff,

v.

CITY OF AURORA, COLORADO;
MATTHEW MILLIGAN, Aurora Police Officer, in his individual capacity;
DOMINIC MARZIANO, Aurora Police Officer, in his individual capacity;
GARY RIVALE, Aurora Police Officer, in his individual capacity;
JOE MARTINEZ, Aurora Police Officer, in his individual capacity;
EDWARD CLEMENTS, Aurora Police Officer, in his individual capacity;

    Defendants.

---

**AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff Andre Williams, by and through his attorneys Faisal Salahuddin and Melissa Roth of FRANK & SALAHUDDIN LLC, respectfully alleges for his Compliant and Jury Demand as follows:

**INTRODUCTION**

1. This is a civil rights action for monetary damages, declaratory relief, injunctive relief, and relief in the nature of mandamus, brought pursuant to 42 U.S.C. § 1983.

2. Andre Williams is a 44-year old African American man with no criminal convictions and a history of epileptic seizure disorder.

3. On September 6, 2018, while Mr. Williams was suffering from an epileptic seizure, Aurora Police Department Officers, Defendants Matthew Milligan, Dominic Marziano, Gary Rivale, Joe Martinez, and Edward Clements used excessive force against Mr. Williams. The Defendants repeatedly punched and tased Mr. Williams, including while he was restrained, to effectuate an unlawful arrest of Mr. Williams and then initiated the filing of false charges against him.

## JURISDICTION AND VENUE

4. This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. This Court possesses subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 2201-02. Mr. Clark seeks relief in the nature of mandamus, 28 U.S.C. § 1361.

5. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

6. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred in the State of Colorado, and all the parties were residents of and/or domiciled in the State at the time of the events giving rise to this Complaint.

## PARTIES

7. Andre Williams is a 44-year-old African American man. He is a resident of Colorado and was a resident of Colorado at all times relevant to this Complaint.

8. Defendant City of Aurora, Colorado ("Aurora") is a Colorado municipal corporation.

9. At all times relevant to this Complaint and Jury Demand, Defendant Officer Matthew Milligan was a resident of the State of Colorado. At all relevant times, Defendant Milligan was acting within the scope of his official duties and employment and under color of state law in his capacity as a police officer for the Aurora Police Department.

10. At all times relevant to this Complaint and Jury Demand, Defendant Officer Dominic Marziano was a resident of the State of Colorado. At all relevant times, Defendant Marziano was acting within the scope of his official duties and employment and under color of state law in his capacity as a police officer for the Aurora Police Department.

11. At all times relevant to this Complaint and Jury Demand, Defendant Officer Gary Rivale was a resident of the State of Colorado. At all relevant times, Defendant Rivale was acting within the

scope of his official duties and employment and under color of state law in his capacity as a police officer for the Aurora Police Department.

12. At all times relevant to this Complaint and Jury Demand, Defendant Officer Joe Martinez was a resident of the State of Colorado. At all relevant times, Defendant Martinez was acting within the scope of his official duties and employment and under color of state law in his capacity as a police officer for the Aurora Police Department.

13. At all times relevant to this Complaint and Jury Demand, Defendant Officer Dominic Marziano was a resident of the State of Colorado. At all relevant times, Defendant Marziano was acting within the scope of his official duties and employment and under color of state law in his capacity as a police officer for the Aurora Police Department.

14. At all times relevant to this Complaint and Jury Demand, Defendant Officer Edward Clements was a resident of the State of Colorado. At all relevant times, Defendant Clements was acting within the scope of his official duties and employment and under color of state law in his capacity as a police officer for the Aurora Police Department.

15. Throughout this Complaint and Jury Demand, when referring to Defendants Milligan, Marziano, Rivale, Martinez, and Clements in their individual capacities as law enforcement officers for the Aurora Police Department, the moniker "Individual Defendants" is used.

## FACTUAL ALLEGATIONS

### A. The City of Aurora Violated the *Burrell* Settlement Concerning the City's Obligation to Provide Seizure-Related Training to its Officers

16. On January 22, 2013, City Attorney Charles Richardson entered a settlement agreement in *Rickey Burrell v. City of Aurora, et al.*, Civil Action No. 11-cv-02766-RPM in the District of Colorado, in which in addition to a monetary settlement, the City of Aurora agreed to the following non-monetary requirement:

> [T]he parties acknowledge that the City of Aurora shall provide annual seizure-related training to all of its peace officers by July 2013, and that upon the completion of the seizure-related training, all peace officers must satisfactorily pass a test indicating retention of the seizure-related training.

17. There was no expiration to this non-monetary portion of the *Burrell* settlement agreement. The agreement required Aurora to provide ongoing annual training to its police officers concerning the recognition of seizures and the way to interact with a person suffering a seizure.

18. Defendant Aurora, through the Aurora Police Department, has failed to comply with the *Burrell* settlement agreement, directly causing the Individual Defendants' brutalization of Mr. Williams.

19. Although Aurora temporarily complied with this settlement agreement, Defendant Aurora is now in violation of the *Burrell* settlement agreement.

20. In 2014, City Attorney Michael Hyman replaced City Attorney Charles Richardson.

21. Mr. Hyman promptly chose to disregard and violate the *Burrell* settlement agreement.

22. Under Mr. Richardson, Aurora complied with the *Burrell* settlement agreement and provided annual seizure-related training to its police officers.

23. Before Mr. Hyman was appointed City Attorney, Individual Defendants Matthew Milligan, Dominic Marziano, Gary Rivale, Joe Martinez, Edward Clements each attended annual seizure-related training and satisfactorily completed the seizure-related training test.

24. None of these Individual Defendants attended seizure-related training after 2014.

25. In violation of the *Burrell* settlement agreement, Aurora ended its annual seizure-related training completely in 2016.

26. Two years later, the Individual Defendants brutalized Mr. Williams while he was suffering from a seizure. Aurora's need to give annual seizure-related training and Aurora's liability for the

unconstitutional actions of its officers could not be better illustrated than by the unconstitutional behavior of these Aurora Police Officers.

**B. <u>Aurora Police Officers Failed to Recognize Clear and Unmistakable Signs that Mr. Williams was Suffering from a Seizure on September 6, 2018</u>**

27. On September 6, 2018, Mr. Williams was involved in a car accident near the intersection of East Alameda Avenue and South Potomac Street. The accident occurred around 4:51 PM.

28. Defendant Aurora Police Officer Clements issued Mr. Williams a citation for careless driving for this accident.

29. Among other law enforcement officers, Defendants Edward Clements and Matthew Milligan responded to the accident and interacted with Mr. Williams over the course of thirty minutes.

30. Although Mr. Williams was initially responsive to officers, Defendant Clements noticed the symptoms of Mr. Williams' seizure when he issued Mr. Williams the citation for careless driving.

31. Defendant Clements, noting the change in Mr. Williams's demeanor, stated the following:

> "You ok?"
> "You seem just kind of..."
> "This behavior is a little concerning, just lackadaisical to me."
> "I'm just concerned because this happened and you kind of, you're not even phased by it."
> "I'm just making sure you're ok."
> "You're not ok?"
> "Do you want an ambulance?"
> "Well, hopefully things work out for you."

32. Defendant Clements failed to recognize Mr. Williams's odd behavior as caused by a seizure and left Mr. Williams with the tow truck driver.

33. Around thirty minutes later, the tow truck company called the Aurora Police Department for assistance due to Mr. Williams's continuing odd behavior.

34. The company reported that Mr. Williams was not fighting, but that he was not cooperating with them. Mr. Williams was not responding to their requests, was standing on the bed of the truck, and was not getting off of the truck despite being asked to do so.

35. Defendants Dominic Marziano, Matthew Milligan, Edward Clements, Gary Rivale, and Joe Martinez responded to the scene to contact Mr. Williams.

36. Defendant Aurora failed to provide annual seizure-related training to any of these Individual Defendants as mandated by the *Burrell* settlement agreement for at least four years.

37. The lapse in seizure-related training was in violation of the *Burrell* settlement.

38. The failure to train, supervise, and correct law enforcement's response to seizure-related contact predictably and directly resulted in the Aurora Police Department's assault on Mr. Williams in 2018.

39. After the tow truck driver called for police assistance, Defendant Marziano was the first officer who responded to the scene.

40. Defendant Marziano asked Mr. Williams repeatedly—at least 11 times according to his report—to get off the tow truck.

41. Mr. Williams was peaceful but non-responsive.

42. Mr. Williams can be seen on video making repetitive movements and shifting his weight.

43. If the Individual Defendants had been trained as required by the *Burrell* settlement, they would have recognized that Mr. Williams was exhibiting textbook signs of a seizure.

44. For example, in the training video called "It Could be Epilepsy" used in training during Aurora's initial compliance with the *Burrell* settlement, Mr. Williams' behavior is described as one of several "automatic behaviors" that can be exhibited by someone having a seizure.

45. If the Individual Defendants had been trained according to the requirements of the *Burrell* settlement, they would have been up to date on their seizure-related training and recognized Mr. Williams's behavior as indicating that he was suffering from a seizure.

46. The Individual Defendants would also have known how to appropriately respond to a person exhibiting those symptoms.

6

47. Instead of speaking to Mr. Williams in a calm voice or recognizing that Mr. Williams was unable to respond to the officer's orders due to his medical emergency, Defendant Marziano repeatedly yelled at Mr. Williams.

48. Rather than ask Mr. Williams any questions about his condition or even consider that Mr. Williams was having a medical emergency, Defendant Marziano called for backup, asking for them to expedite his request because "this guy is being a pain in the butt."

49. Immediately after requesting backup, Defendant Marziano prepared to beat Mr. Williams for his perceived non-compliance, slowly and methodically putting on his leather gloves.

50. Defendant Milligan arrived on scene next.

51. While Mr. Williams continued to exhibit classic signs of a seizure, Defendant Milligan also began yelling at Mr. Williams and further escalated the situation.

52. Defendants Gary Rivale, Edward Clements, and Joe Martinez also responded to the scene and continued to escalate the situation.

53. At no point did any of the Individual Defendants ask Mr. Williams if he was suffering from any medical conditions.

54. Mr. Williams's wife, Yvette Williams, contacted 911 and told dispatch she would be arriving on scene shortly.

55. No officer or agent of law enforcement asked Ms. Williams if her husband was suffering from any medical conditions during this 911 call.

56. When Mr. Williams eventually came down from the bed of the tow truck, he did so slowly, voluntarily, and with both of his hands visible at all times.

57. When Mr. Williams' feet reached the ground, the Individual Defendants immediately began using violence against him. Even if Mr. Williams had not been suffering a seizure, the force the Individual Defendants used was wildly excessive.

58. Making matters worse, the Individual Defendants behaved like officers who had not been trained in dealing with someone in the midst of a seizure.

59. If Defendant Aurora had complied with its legal obligations and property trained these officers, then the officers would have known that going "hands on" with someone in the midst of a seizure can exacerbate the symptoms of a seizure and cause someone in the throes of a seizure to act aggressively, not out of anger or resistance, but because that person is not in control of their emotional and physical responses.

60. Instead of following the seizure-related training, Defendant Marziano reached out and grabbed Mr. Williams forcibly by the arm.

61. Defendant Marziano's unlawful arrest of Mr. Williams can be clearly seen on Defendant Milligan's body worn camera.

62. That footage shows that when Mr. Williams predictably pulled his arm away from Defendant Marziano's touch, Defendant Milligan jumped in and tackled Mr. Williams from behind.

63. The other Individual Defendants, including Defendant Rivale, joined the assault on Mr. Williams.

64. Mr. Williams was having a medical emergency prior to and throughout his assault by the Individual Defendants.

65. While at least three police officers had Mr. Williams pinned to the ground on his side, Defendant Marziano repeatedly punched Mr. Williams in the head.

66. As Mr. Williams repeatedly asked the officers to stop hitting him, the Individual Defendants yelled, "stop resisting," and "get on your stomach."

67. Mr. Williams said, "I will." Mr. Williams can then be seen on video attempting to roll to his stomach.

68. The Individual Defendants ordered Mr. Williams to put his arm behind his back, and he responded, "Ok, I will, stop."

69. At this point, Mr. Williams was already bleeding from his head.

70. Mr. Williams' body then became very still as he repeated the word "stop" rhythmically and repeatedly.

71. This symptomology is the same type of automatic behaviors described in the seizure-related training.

72. The Individual Defendants yelled at the seizing Mr. Williams, "you better fucking relax, dude," and "quit tensing up."

73. Mr. Williams then began groaning repeatedly as the officers physically pulled his left arm behind his back.

74. Because Mr. Williams was having a seizure and could not respond to the Defendants' orders to stop tensing up, Defendant Milligan continued to brutalize Mr. Williams, kneeing him on the back of his thighs and buttocks three times.

75. As a result of the force employed by Defendant Milligan, Mr. Williams's pants and briefs fell below his buttocks.

76. Mr. Williams's buttocks was humiliatingly exposed for the duration of the assault.

77. While the Individual Defendants assaulted him, Mr. Williams' body remained very tense as a direct result of his seizure.

78. Mr. Williams' inability to relax his body was incorrectly perceived by Individual Defendants as a continuing refusal to comply with their orders despite their use of force.

79. Because he did not identify Mr. Williams' inability to respond as a symptom of a seizure, Defendant Milligan stated, "I'll just tase him."

80. Despite the fact that Individual Defendants had Mr. Williams restrained on the ground with one hand behind his back, Defendant Milligan tased Mr. Williams in the back.

81. Officer Milligan used a drive stun technique, forcing the taser directly into Mr. Williams's back.

82. As the City of Aurora knows, a drive stun is a pain compliance technique, which the Department of Justice advises should be avoided: "Using the ECW to achieve pain compliance may have limited effectiveness and, when used repeatedly, may even exacerbate the situation by inducing rage in the subject."

83. Under optimal circumstances, a drive stun usage of a taser should be avoided. When the subject is having a seizure, it is an inexcusable use of force.

84. Mr. Williams screamed in pain as the taser deployed an electric current through his body.

85. The worst offense that Mr. Williams was accused of at this point was being non-responsive to the officers' orders.

86. After tasing Mr. Williams, the Individual Defendants continued their assault.

87. Mr. Williams was not shouting, was not attempting to run, and was not doing anything that could be interpreted as attempting to flee. The most Mr. Williams did was that initial single flinching movement of his arm.

88. Mr. Williams continued to groan incoherently.

89. The Individual Defendants again screamed at Mr. Williams, "Stop resisting!"

90. At this point, the Individual Defendants successfully pulled Mr. Williams's right arm behind his back.

91. While three officers pinned Mr. Williams down and had control of both of Mr. Williams' arms behind his back, Defendant Milligan again used a stun drive on Mr. Williams, pressing the taser directly into Mr. Williams' back.

92. Once again, Mr. Williams screamed in pain as the taser deployed an electric current through his body.

93. The Individual Defendants then placed Mr. Williams in handcuffs.

94. After handcuffing Mr. Williams, the Individual Defendants still threatened to hobble Mr. Williams by tying his arms and feet together behind his back.

95. Mr. Williams did not make a coherent response to being handcuffed or to the threat that he would be hobbled. Instead, Mr. Williams continued to groan.

96. The Individual Defendants asked Mr. Williams, "are you done?" and "what are you on?"

97. Mr. Williams still could not respond to the officers.

98. Because Defendant Aurora chose to disregard its obligations under the *Burrell* Settlement, these Individual Defendants demonstrated complete cluelessness in responding to a member of the community who was doing nothing wrong and clearly suffering from a seizure.

99. Because Defendant Aurora chose to disregard its obligations under the *Burrell* settlement, these Individual Defendants humiliated and pummeled Mr. Williams for the non-criminal act of being "non-responsive" during a seizure.

100. If Defendant Aurora had met its obligations under the *Burrell* settlement, the Individual Defendants would have known that seizures can often be mistaken for impairment by drugs and alcohol.

101. If Defendant Aurora had met its obligations under the *Burrell* settlement, the Individual Defendants would have recognized that Mr. Williams may not have been responsive due to a seizure that rendered him cognitively and physically unable to respond.

102. It was objectively unreasonable for the Individual Defendants to restrain Mr. Williams while he was in the midst of a seizure.

103. It was objectively unreasonable for the Individual Defendants to have forced Mr. Williams face-first onto the pavement with the weight of multiple officers on top of him, which placed Mr. Williams at risk for positional asphyxiation while he was in the midst of a seizure.

104. The Individual Defendants should instead have left Mr. Williams on the tow truck, where he was not harming or threatening anyone, and called EMS.

105. If the Individual Defendants had been properly trained and acted reasonably, they would have recalled from the training video that placing someone under arrest and taking him into custody when he is suffering from a seizure constitutes an unlawful arrest.

**C. The City of Aurora Condoned and Tolerated a Culture of Violence Leading to the Inevitable Violation of Mr. Williams' Civil Rights**

106. Defendant Aurora, the Aurora Police Department, and its employees have been sued for numerous excessive force violations.

107. Defendant Aurora and the Aurora Police Department have consistently failed to adequately investigate or to take corrective action to prevent excessive force violations from happening in the future.

108. The actions of the Individual Defendants deprived Mr. Williams of his right to be free from excessive force and those actions were motivated by an unconstitutional policy, pattern, practice, or custom of Defendant Aurora and the Aurora Police Department.

109. Defendant Aurora and the Aurora Police Department do not adequately enforce any existing policies designed to prevent the use of excessive force, do not properly document incidents of excessive force, do not properly investigate complaints of excessive force, and engage in a policy, pattern, practice, and custom of failing to reprimand or discipline police officers and other agents of law enforcement for excessive force violations.

110. The failure of Defendant Aurora to address excessive force committed by Aurora police officers and other law enforcement agents amounted to a tacit approval of the use of excessive force prior to the brutal attack Individual Defendants subjected Mr. Williams to as he suffered from a seizure on September 6, 2018.

111. Not only was Mr. Williams unlawfully arrested, the Individual Defendants used objectively unreasonable and excessive force against Mr. Williams.

112. Mr. Williams did not pose any threat to the Individual Defendants, other police officers, or civilians while he was standing on the tow truck bed.

113. Defendant Marziano and the other Individual Defendants initiated their use of excessive force against Mr. Williams solely because they claimed that Mr. Williams did not comply with their orders for him to get off of the tow truck bed.

114. Defendant Marziano and the other Individual Defendants lacked probable cause to arrest Mr. Williams at the point when Individual Defendants forcibly seized Mr. Williams as he was in the process of voluntarily getting down from the tow truck bed when the Individual Defendants initiated their use of excessive force against him.

115. The actions of the Individual Defendants against Mr. Williams constituted clear excessive force.

116. Even if the Individual Defendants had forcibly arrested Mr. Williams in the brutal manner detailed herein before Mr. Williams was clearly attempting to comply with their orders to get off of the tow truck bed, their actions still would have clearly constituted excessive force given the low offense level of failure to comply with police orders, the only offense Mr. Williams had allegedly committed prior to the initiation of the use of force against him.

117. To cover up their misconduct, Defendants Marziano, Milligan, and Rivale wrote police reports alleging conduct by Mr. Williams that they knew to be false, or mischaracterized Mr. Williams' behavior and demeanor.

118. Defendant Milligan falsely claimed, for example, that Mr. Williams was "actively fighting against Officer Marziano," when Mr. Williams was merely tense and non-responsive.

119. When the Individual Defendants' reports are reviewed in the context of Mr. Williams having a seizure, the evidence of Mr. Williams' seizure is clear and obvious.

120. Defendant Milligan described Mr. Williams' reaction to Defendant Marziano grabbing him as "clinch[ing] his fist' and his "body tens[ing] up."

121. Defendant Marziano described that Mr. Williams "continued to resist by tensing up."

122. Defendant Marziano further described Mr. Williams's actions as "flex[ing] and pull[ing] away," and stated that Mr. Williams "began thrashing his body."

123. Finally, Defendant Marziano stated in his report that Mr. Williams, a man who was actually suffering from a seizure at the time, "was growling at us, almost imitating an aggressive animal."

124. The fact that these officers failed to recognize a man having a medical emergency and treated him instead like an "aggressive animal" cannot be justified or excused. Furthermore, the racial overtones of this language are undeniable.

125. As a result of the Individual Defendants' actions, Mr. Williams was hospitalized.

126. Mr. Williams finally received medical treatment for his seizure in the hospital.

127. Mr. Williams also received medical treatment for injuries inflicted by the excessive force the Individual Defendants used while he suffered a seizure.

128. Mr. Williams was unlawfully charged with two misdemeanor offenses: one count of resisting arrest, a class 2 misdemeanor, in violation of C.R.S. § 18-8-103, and one count of obstructing a peace officer, a class 2 misdemeanor, in violation of C.R.S. § 18-8-104(1)(a).

129. Mr. Williams incurred legal fees during the course of the prosecution against him.

130. Rather than conduct a trial they were sure to lose, the City Attorney dismissed all charges against Mr. Williams on February 28, 2019.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Excessive Force**
**42 U.S.C. § 1983 – Fourth Amendment Violation**
**Defendants Milligan, Marziano, Martinez, Rivale, and Clements**

131. Mr. Williams incorporates all other paragraphs as if fully set forth herein.

132. At all relevant times hereto, the Individual Defendants were acting under the color of state law in their capacities as Aurora law enforcement officers.

133. Mr. Williams had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement.

134. Defendants Milligan, Marziano, Martinez, Rivale, and Clements subjected Mr. Williams to force which, judged from a perspective of a reasonable officer on the scene, was unreasonable.

135. At all times relevant hereto, Mr. Williams committed no crime.

136. At all times relevant hereto, Mr. Williams posed no threat to any law enforcement officers.

137. At all times relevant hereto, Mr. Williams did not attempt to evade arrest by flight, and his only action that could arguably be perceived as resisting arrest was his failure to respond to officers' commands due to his seizure.

138. When a law enforcement officer knows or should know that an individual has special characteristics making him or her more susceptible to harm from a particular use of force, the individual's condition mandates the use of less restrictive means of physical restraint.

139. At all times relevant hereto, Mr. Williams was suffering from a seizure.

140. The Individual Defendants should have been properly trained to recognize and should have recognized that Mr. Williams was suffering from a seizure.

141. The fact that Mr. Williams was having a seizure when the Individual Defendants assaulted him is a special characteristic that rendered Mr. Williams more susceptible to harm from being slammed to the ground, punched, forcibly restrained, and tased multiple times because he was extremely vulnerable since he was in the midst of a medical emergency and was physically unable to control his body.

142. The fact that Mr. Williams was having a seizure when the Individual Defendants assaulted him required the Individual Defendants to utilize either no force against him or, at most, a less restrictive means of physical restraint.

143. Under these circumstances, the Individual Defendants had no justification for subjecting Mr. Williams to *any* physical force.

144. The Individual Defendants certainly had no justification for slamming Mr. Williams to the ground, punching him in the head multiple times, forcing his arms behind his back, tasing him while his arms were restrained, and tasing him again after he was placed in handcuffs as they effectuated an illegal arrest.

145. These actions caused Mr. Williams substantial harm and were also a proximate cause of the Individual Defendants' subsequent initiation of false and unfounded criminal charges against Mr. Williams.

## SECOND CLAIM FOR RELIEF
***Monell* – Failure to Provide Seizure-Related Training as Mandated by *Burrell***

**Defendant Aurora**

131. Mr. Williams incorporates all other paragraphs as if fully set forth herein.

132. At all relevant times hereto, the Individual Defendants were acting under the color of state law in their capacities as Aurora law enforcement officers.

133. The actual customs, policies, and practices of Defendant Aurora concerning police actions regarding seizure-related training and the appropriate identification of and response to people experiencing seizures was a proximate cause of substantial harm to Mr. Williams.

134. Aurora's inadequate training, supervision, and/or discipline results from a conscious or deliberate choice to cease the annual seizure-related training program they were required to perform under the terms of the *Burrell* settlement agreement and to instead follow a course of action that was foreseeably likely to result in the deprivation of constitutional rights of people suffering from seizures.

135. Defendant Aurora was deliberately indifferent to Plaintiff's constitutional rights, because Defendant Aurora knew that individuals in Mr. Williams' position would be at a substantial risk of suffering dangerous consequences from Aurora's failure to properly train and supervise its employees.

136. In light of the duties and responsibilities of Defendant Aurora's police officers and the annual seizure-related training requirement of the *Burrell* settlement agreement, the need for specialized training, supervision, and discipline regarding seizure identification and appropriate responses is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Aurora is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

137. Defendant Aurora's policies, customs, and practices in failing to properly train, supervise, and/or discipline its employees were a moving force and proximate cause of the Individual Defendants' violation of Mr. Williams' constitutional rights.

138. Mr. Williams has been and continues to be damaged by Defendants' use of excessive force against him because such conduct caused and causes him physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, sense of security, and individual dignity, among other injuries, losses, and damages.

139. The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Mr. Williams' injuries, losses, and damages.

### THIRD CLAIM FOR RELIEF
#### *Monell* – Pattern and Practice of Excessive Force
#### Defendant Aurora

140. Mr. Williams incorporates all other paragraphs as if set forth fully herein.

141. At all relevant times hereto, the Individual Defendants were acting under the color of state law in their capacities as Aurora law enforcement officers.

142. The actual customs, policies, and practices of Defendant Aurora in failing to properly train, supervise, and/or discipline its employees were a moving force and proximate cause of substantial harm to Mr. Williams.

143. The actual customs, policies, and practices of Defendant Aurora in failing to properly train, supervise, or discipline its employees were a moving force and proximate cause of the Individual Defendants' violation of Mr. Williams' clearly established constitutional right to be free from excessive force.

144. Aurora's inadequate training, supervision, and discipline results from a conscious and deliberate choice that was foreseeably likely to result in the deprivation of constitutional rights of people who came into contact with the police.

145. Defendant Aurora was deliberately indifferent to Plaintiff's constitutional rights, because Defendant Aurora knew that individuals in Mr. Williams' position would be at a substantial risk of suffering dangerous consequences from Aurora's failure to properly train and supervise its employees.

146. In light of the duties and responsibilities of Defendant Aurora's police officers, the need for specialized training, supervision, and discipline regarding the appropriate and acceptable use of force is so obvious, and the inadequacy of appropriate training and/or supervision is so likely to result in a violation of constitutional rights, such as those described herein, that Defendant Aurora is liable for its failure to properly train, supervise, and/or discipline its subordinate employees and agents.

147. Defendant Aurora's policies, customs, and practices in failing to properly train, supervise, and/or discipline its employees were a moving force and proximate cause of the Individual Defendants' violation of Mr. Williams' constitutional rights.

148. Mr. Williams has been and continues to be damaged by Defendants' use of excessive force against him because such conduct caused and causes him physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, sense of security, and individual dignity, among other injuries, losses, and damages.

149. The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom, and/or practice described herein, were the legal and proximate cause of Mr. Williams' injuries, losses, and damages.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Williams respectfully requests that this Court enter judgment in his favor against Defendants, and award him all relief as allowed by law, including but not limited to the following:

a) Appropriate relief at law and equity;

b) Declaratory relief, injunctive relief, and other appropriate equitable relief;

c) Compensatory and punitive damages on all claims allowed by law in an amount to be determined at trial;

d) Relief in the nature of mandamus;

e) Attorneys' fees and the costs associated with this action on all claims pursuant to 42 U.S.C. §1988 and all applicable law;

f) Pre- and post-judgment interest at the appropriate lawful rate;

g) Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Dated: December 23, 2019

*/s/ Faisal Salahuddin*
Faisal Salahuddin
Melissa Roth
FRANK & SALAHUDDIN LLC
1741 High Street
Denver, CO 80218
Telephone: (303) 974-1084
Fax: (303) 974-1085
fas@fas-law.com
melissa@fas-law.com
*Attorneys for Plaintiffs*